**Jules LINK and Solomon Katz, on behalf of themselves and all others similarly situated, Appellants,**

v.

**MERCEDES-BENZ OF NORTH AMERICA, INC. and Daimler-Benz A.G. and Daimler-Benz of North America Holding Co., Inc. (428).**

Nos. 85–1552, 85–1651.

United States Court of Appeals,
Third Circuit.

Argued March 6, 1986.

Decided April 16, 1986.

Harold E. Kohn, Stuart H. Savett, Robert J. LaRocca, William B. Lytton, Victor P. Barall, Kohn, Savett, Marion & Graf, P.C., William A. DeStefano, DeStefano & Guernsey, Philadelphia, Pa., Richard F. Stevens, (argued), Butz, Hudders, Tallman, Stevens & Johnson, Allentown, Pa., for appellants.

Spencer Ervin, Jr. (argued), R. Mark Armbrust, Wilbur Bourne Ruthrauff, Robert J. Spiegel, Mercer D. Tate, T. Sergeant Pepper, Charlotte E. Thomas, Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., for appellees Mercedes-Benz of North America, Inc., Daimler-Benz, A.G. and Daimler-Benz of North America Holding Co., Inc.

Allan G. Freund, Wayne H. Samson, Mercedes-Benz of North America, Inc. Montvale, N.J., for appellee Mercedes-Benz of North America, Inc.

Before ALDISERT, Chief Judge, and SEITZ and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ALDISERT, Chief Judge.

Following an adverse jury verdict, the unsuccessful representatives of a certified plaintiff class filed several post-trial motions for a new trial or judgment n.o.v. Denied relief, they appeal, contending that the district court committed at least eleven reversible errors. In addition, they successfully petitioned for an interlocutory appeal under 28 U.S.C. § 1292(b) questioning the grant of adverse summary judgment, under the doctrine of *Illinois Brick Co. v.* *Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), on a portion of their claim. We will affirm the judgment and orders of the district court in all respects, with one minor exception regarding the composition of the plaintiff class, 618 F.Supp. 679.

I.

Appellants are representatives of a certified class of consumers who purchased non-warranty repair services from various Mercedes-Benz dealerships throughout the country between March 27, 1970, and the time of trial. The appellees are Daimler Benz Aktiengesellschaft, the German parent company; Mercedes-Benz of North America Holding Company, Inc., its wholly owned subsidiary; and Mercedes-Benz of North America, Inc. (MBNA), the wholly owned subsidiary of the holding company. Appellants' complaint alleged that these entities, which we will refer to collectively as Mercedes, conspired with their authorized dealers "to fix, raise and maintain rates charged for non-warranty auto repairs performed on Mercedes-Benz automobiles by ... basing the rates on the parts' prices and labor times set forth" in a manual known as the MBNA Labor Time Guide, thereby violating § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, App. at 34–35. The complaint named authorized Mercedes dealers as co-conspirators.

The Mercedes Labor Time Guide lists many typical repairs and assigns a certain number of "operation hours" to each. Dealers who follow the guide do not ordinarily charge the customer for the actual time spent repairing the customer's automobile, but charge whatever "operation" period of time is specified for the particular repair in the guide. Each dealer, in addition, sets an hourly rate to be charged consumers for mechanics' services. The hourly rate is multiplied by the time unit specified in the guide to reach a "total price" for each repair. Appellants theorized that Mercedes and their dealers used the time guide as a vehicle to conspire "to

fix, raise and maintain" the price of non-warranty repairs.

Prior to trial, the district court granted partial summary judgment for Mercedes on that portion of the complaint alleging price fixing of Mercedes parts used in the non-warranty repairs. The court held that *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), barred the claim for damages on the parts portion of the complaint. App. at 2.798–813. The court first ruled that appellants could proceed on their parts claim for injunctive relief, but then decided to try the labor and parts claims separately, with the labor claim first. After a seven week trial on the charge of price fixing of labor only, the jury found that Mercedes had not conspired with its dealers "to fix and raise the labor charges for non-warranty repair work." App. at 9,863. The district court entered judgment on the verdict.

Appellants filed several post-trial motions for a new trial or judgment n.o.v., challenging the validity of the verdict, the jury instructions, and various evidentiary rulings. The district court denied these motions and the plaintiffs appealed. The district court also certified the *Illinois Brick* issue under 28 U.S.C. § 1292(b). The claim for injunctive relief on the parts claim is still open.

## II.

In the direct appeal, No. 85–1552, appellants present a number of issues. They maintain that the district court erred in denying their summary judgment, directed verdict, and judgment n.o.v. motions. Alternatively, they argue that because the district court improperly decided numerous evidentiary issues and improperly instructed the jury, a new trial is required.

The applicable standards of review are well settled. In reviewing a district court's summary judgment ruling, the court of appeals must "apply the same test the district court should have utilized initially." *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

The district court must determine whether "no genuine issue as to a material fact remains for trial and that the moving party is entitled to judgment as a matter of law." *Id.*

Next, when reviewing a denial of a directed verdict, "[w]e must determine whether, as a matter of law, the record is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief.... [I]f the evidence is of such character that reasonable men, in the impartial exercise of their judgment may reach different conclusions, the case should be submitted to the jury." *Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir.1978).

Finally, judgment n.o.v. is an extraordinary remedy when urged by an unsuccessful plaintiff who bore the burden of proof at trial. In order to grant the motion, the district court " 'must be able to say that there is insufficient evidence for permitting a different finding.' " *Gatenby v. Altoona Aviation Co.,* 407 F.2d 443, 446 (3d Cir. 1968) (quoting *Mihalchak v. American Dredging Co.,* 266 F.2d 875, 877 (3d Cir. 1959)). On appeal we are required "to review the record in this case in the light most favorable to the non-moving party, ... and to affirm the judgment of the district court denying the motion[ ] unless the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.' " *Dawson v. Chrysler Motors Corp.,* 630 F.2d 950, 959 (3d Cir.1980) (quoting *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969)), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).

▪ Normally, the district court's ruling on a motion for a new trial is reviewed for abuse of discretion, *Wagner v. Pennsylvania Railroad Co.,* 282 F.2d 392 (3d Cir.1960), but "if the court's denial was based on the application of a legal precept, review is plenary." *Koshatka v. Philadelphia Newspapers, Inc.,* 762 F.2d 329, 333 (3d Cir.1985). Where a contention for a new trial is based on the admissibility of

evidence, the "trial court has great discretion ... which will not be disturbed on appeal absent a finding of abuse." *Kane v. Ford Motor Co.,* 450 F.2d 315, 316 (3d Cir.1971). The standard of review for the district court's ruling on points for charge is also abuse of discretion. However, "[o]nce the court has given an instruction, we must 'determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury.'" *United States v. Fischbach & Moore, Inc.,* 750 F.2d 1183, 1195 (3d Cir.1984) (quoting *Ayoub v. Spencer,* 550 F.2d 164, 167 (3d Cir.), *cert. denied,* 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977)), *cert. denied,* — U.S. ——, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985). We should reverse the trial court "only if the instruction was capable of confusing and thereby misleading the jury." *Id.*

## III.

Based on appellants' brief and oral argument, we understand appellants to contend that the documentary evidence submitted at trial was sufficient to establish, as a matter of law, that Mercedes conspired with its dealers to fix prices for non-warranty repairs in violation of the Sherman Act. Appellants allege that this price-fixing scheme had two components: first, to standardize the time for making typical repairs; and second, to fix the hourly labor costs of such repairs.

To establish their allegations of a conspiracy between Mercedes and its dealers to standardize "operations hours," appellants introduced copies of Mercedes "time guides"; evidence of a "service management control system" designed to note disparities between actual repair times and those suggested by the time guides; evidence of agreements pursuant to which dealers sent employees to seminars at which Mercedes taught and distributed the service management control system and time guides; evidence of agreements pursuant to which dealers agreed to accept Mercedes' recommendations concerning use of time guides and service management

control systems; and evidence of meetings organized by Mercedes in which dealers and their employees discussed time guides and service management controls. *See* Brief for Appellants at 19–20. To establish their allegations of a conspiracy between Mercedes and its dealers to fix the hourly labor costs of repairs, appellants introduced Dealer Operating Requirement Agreements in which dealers listed the hourly rates charged customers for repairs; evidence that Mercedes promulgated and instructed dealers' employees in the use of labor rate "formulaes" to generate service department gross profits of 55% to 65%; and evidence that Mercedes monitored the profitability of its dealers' service departments. *See* Brief for Appellants at 20–21. Based on this documentary evidence, appellants filed motions for summary judgment, directed verdict, and judgment n.o.v., all of which were denied by the district court.

■ Section 1 of the Sherman Act prohibits "[e]very contract, combination ..., or conspiracy in restraint of trade...." 15 U.S.C. § 1. To establish a civil cause of action under Section 1, a plaintiff must prove four elements:

(1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy.

*Tunis Brothers v. Ford Motor Co.,* 763 F.2d 1482, 1489 (3d Cir.1985). The presence of concerted action is thus an essential element of a claim under Section 1; mere unilateral or independent activity, whatever its motivation, cannot give rise to an antitrust violation. *Fragale & Sons Beverage Co. v. Dill,* 760 F.2d 469, 473 (3d Cir.1985).

■ Appellants' theory of recovery is based on allegations of a "vertical" combination between Mercedes and its dealers to fix the price of labor for repairs. Brief for

Appellants at 27. The requisite elements of proof to establish a violation of section 1 on this theory are well established. Because "[a] manufacturer and its distributors have legitimate reasons to exchange information about the price and the reception of [their] products in the market," *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984), "the antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective'". *Id.* at 764, 104 S.Ct. at 1471 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 (3d Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981)). In addition, a section 1 plaintiff must introduce "evidence that tends to exclude the possibility that the manufacturer and ... distributors were acting independently." *Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471.

■ The documentary evidence introduced by appellants was certainly sufficient to demonstrate an opportunity for conspiracy between Mercedes and its dealers. Appellants did not, however, conclusively "exclude the possibility" that Mercedes' dealers "were acting independently" in setting their prices for repair work. *See Monsanto*, 465 U.S. at 764, 104 S.Ct. at 1471. Based upon the documentary evidence alone, because appellants did not exclude the possibility of independent action, it cannot reasonably be said that "the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R. Civ. P. The district court, therefore, did not err in denying appellant's motion for summary judgment.

At trial Mercedes presented forty-one fact witnesses and three expert witnesses to show that individual dealers independently decided whether to use the Mercedes guide or any other method for deter-

mining repair charges. Without cataloguing the evidence, we note that the testimony showed that Mercedes was concerned that its franchisees provide efficient non-warranty repairs to ensure customer satisfaction and repeat business, *e.g.*, app. at 7671–73, and that use of the time guide, as an element of Mercedes' "service management control" system, was designed for this purpose. *Id.* at 7698–704. Experts testified that because of Mercedes' interest in encouraging repeat customers, it would be against its economic interest to raise or fix repair prices. *Id.* at 7,670–82. Most importantly, many dealers testified that they did not inflate or fix repair costs and did not enter into an agreement with Mercedes to do so, *e.g.*, *id.* at 4685, 4929, 5091–92, 5160, 5344, 5408–09, 5623, 5798, 6115.1, 6424, 6613, 6797–98, and that they independently made the decision to use the time guide. *E.g.*, *id.* at 5218, 5743, 6390–91, 6496, 6979. Many dealers testified that they did not use any time guide, or used one other than Mercedes', or used Mercedes' guide in conjunction with another. *E.g.*, *id.* at 4718–19, 4909, 5061–62, 5358, 6759, 6839, 6857, 6902. Evidence that eight other automobile manufacturers distributed similar time guides and encouraged their use for improving repair service efficiency provided additional support for Mercedes' argument that the dealers independently chose to use the time guide because it was generally recognized in the industry as the best method for maximizing shop efficiency. *See, e.g., id.* at 14.180–87 (Ford); 14,849–69 (Chevrolet); 15,662–93 (Porsche, Audi, Volkswagen); 16,006 (Lincoln-Mercury); 16,093 (Datsun); 16,205–214 (American Motors); 16,243–63 (Chrysler); 17,108–286 (Cadillac).[1] In contrast to Mercedes' direct evidence showing no agreement to "inflate, maintain, or fix" prices of non-warranty labor, the appellants called only two witnesses, Jules Link, the class representative, and an economics expert, and relied primarily upon the Mercedes' documents to prove their price fixing case.

---

1. Although appellants objected to the admissibility of other manufacturers' time guides and manuals, we rely on those guides in our discus-

sion because we reject appellants' objections. *See infra* at 930–933.

The district court did not err in denying appellants' motion for a directed verdict because the evidence introduced at trial was "of such character that reasonable men, in the impartial exercise of their judgment may reach different conclusions." *Patzig v. O'Neil,* 577 F.2d at 846.[2]

Finally, appellants have not adequately supported their appeal from the district court's denial of their motion for judgment n.o.v. with a demonstration that the record is "critically deficient of that minimum quantum of evidence" required to allow a jury's verdict to stand.[3] *Dawson,* 630 F.2d at 959. Appellants' exhaustive narration of evidence supporting their conspiracy theory completely ignores all countervailing evidence and thus misconstrues the fundamentals of appellate review. This court does not sit as a jury. We do not rehear or weigh the evidence. Rather, we look to the facts as found by the jury, viewed from the standpoint of the verdict winner, and determine whether there was sufficient record evidence to support the jury's findings. In this instance, we hold that there was. We are satisfied that adequate evidence supports the jury's finding that Mercedes did not conspire with its dealers "to fix and raise the labor charges for non-warranty repair work." The district court therefore did not err in refusing to grant a judgment n.o.v. on the labor claims.

## IV.

Appellants next contend that the district court abused its discretion in not granting a new trial because it committed a "pattern of errors" which requires a new trial. Although appellants raise seven specific allegations of error concerning jury instructions and various evidentiary rulings, we will address only those we believe merit discussion.

### A.

We first turn to the appellants' argument concerning jury instructions. Appellants raise two contentions here. First, appellants argue that the district court incorrectly charged the jury as to the standard of proof required for vertical conspiracies as stated in *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 762, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984), and *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). Appellants next argue that the district court charged the jury differently than it indicated it would at the charge conference, and that the court thus violated Rule 51, F.R.Civ.P.

#### 1.

Appellants contend that the district court's jury charge did not adhere to the guidelines set forth in *Monsanto.* In *Monsanto,* the Supreme Court announced the standard of proof required to find a vertical price fixing scheme. The Court stated that independent action is permissible, noting that

> it is of considerable importance that independent action by the manufacturer, and concerted action on nonprice restrictions, be distinguished from price-fixing agreements, since under present law the latter are subject to *per se* treatment and treble damages. On a claim of concerted price fixing, the antitrust plaintiff must present evidence sufficient to carry its burden of proving that there was such an

---

2. Appellants also emphasized at oral argument that on the basis of the evidence it presented at trial, it was entitled to a specific jury instruction, which if delivered by the court, would have justified a directed verdict. This argument misconstrues the proper function of jury instructions. The sole question for the trial judge and a reviewing court is whether the instructions properly set forth the applicable law in light of *all* the evidence introduced at trial.

3. Furthermore, although rules of this court require that in its brief, appellants' "argument shall contain the contentions of the appellant ... with citation to the ... parts of the record relied upon,". Rule 21(1)(A)(e), U.S.Ct.App.3d Cir. Rules, appellants did not cite to the record at all to support their argument that the evidence "clearly establishes" seventeen factors showing a conspiracy to fix prices. Because the appendix consists of over 18,000 pages in sixteen volumes, appellants' failure to follow our rules is particularly disturbing.

agreement. If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that the doctrine enunciated in [*Continental T.V. Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)] and [*United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919)] will be seriously eroded.

465 U.S. at 763, 104 S.Ct. at 1470. As noted previously, the Court stated that

> [t]he correct standard is that there must be evidence that tends to exclude the possibility of independent action by the manufacturer and distributor. That is, there must be direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.

*Id.* at 768, 104 S.Ct. at 1472.

The district court carefully followed the teachings of *Monsanto* in its instructions. While explaining the interrogatory to the jury, the court stated: "There must be a conscious commitment to a common scheme to fix and raise labor charges for non-warranty repair work. Those are elements that the Plaintiff must prove." App. at 9553. Then the court directly quoted *Monsanto*: "A manufacturer and its dealers have legitimate reasons to exchange information about the prices and the reception of their products in the market." *Id.* at 9556. The court then clearly described the type of conduct that would not be permissible:

> Under our antitrust laws, a manufacturer such as Mercedes may only engage in unilateral action with respect to prices its dealers charge customers. It may not agree or contract or combine or conspire with any of those dealers to fix and raise prices in any way.
>
> Plaintiffs must present evidence that tends to exclude the possibility that Mercedes-Benz and its distributors were acting independently or unilaterally.

*Id.* at 9558. The court further instructed the jury that a manufacturer "must not seek an agreement from its dealer to use the suggested price." *Id.* at 9560.

The court then instructed the jury to determine whether Mercedes' and the dealers' conduct was on the permissible side of the line between independent and concerted action: "[T]he line you must draw here is seeking an agreement followed by an agreement. That's wrong. But announcing a policy and an independent decision by the dealer to follow that policy is all right." *Id.* at 9562. The balance of the charge adhered to the teachings of *Monsanto*.[4]

Appellants specifically cite the district court's refusal to instruct the jury that "acquiescence" by the dealers to Mercedes' requests that they use the time guide would constitute a price fixing violation. Appellants state that the district court refused to read part of footnote nine of *Monsanto*,[5] *see* app. at 9388, and that the court struck "acquiescence" from its charge. *Id.* at 8682. However, the court's concern was that the term "acquiescence" not be taken out of the context of a requirement of concerted activity. *See id.*

---

**4.** Appellants also state that the court's charge was wrong in instructing the jury to determine whether there was a conspiracy to fix *and raise* prices. However, appellants' complaint alleged that Mercedes conspired to "fix, raise and maintain rates charged for non-warranty repairs," app. at 153, and appellants repeatedly stated to the jury in their opening argument that Mercedes' conduct had the effect of "artificially raising and inflating the prices." App. at 3015; *see also id.* at 3024, 3027, 3032, 3042, 3043, 3045, 3047, 3048. Because appellants' complaint and opening arguments so clearly stated that Mercedes conspired to *raise* prices, they may not

complain that the court instructed the jury that it must find a conspiracy to do so.

**5.** Footnote nine reads in its entirety:

> The concept of "a meeting of the minds" or "a common scheme" in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer.

*Monsanto*, 465 U.S. at 764 n. 9, 104 S.Ct. at 1471 n. 9.

at 8522–23. The court offered to read footnote nine in its entirety, but appellants responded that this would not satisfy them. *Id.* at 8519. We believe the district court's refusal to use the word "acquiescence" was not crucial to the fairness of the charge. The charge, when read as a whole, undoubtedly conforms to the instructions of *Monsanto,* and taken as a whole, "fairly and adequately submit[ted] the issues in the case to the jury." *Ayoub,* 550 F.2d at 167.

### 2.

■ We next turn to the appellants' contention that the court violated Rule 51, F.R.Civ.P. That rule states that "[t]he court shall inform counsel of its proposed action upon the request prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed."

Appellants maintain that at the charge conference the court rejected Mercedes' proposed instruction that a franchisor may lawfully advocate, persuade, cajole, teach, and urge its dealers to price its products a certain way. Appellants claim that in their closing argument they argued on the basis of the court's ruling; they contend that they were prejudiced when the court did in fact use Mercedes' words in its subsequent jury instructions.

However, appellants mischaracterize the charge conference outcome. At the charge conference, the court told counsel that it was hesitant to tell the jury that "persuade" and "cajole" were acceptable, app. at 8672, and that *Monsanto* teaches that "the nuances of these words are not important, what's important is whether there was concerted action or not." *Id.* at 8649. The court stated that it would give the jury

"guidelines as to what's independent activity in pricing non-warranty repair work and what's concerted activity and where they should draw the line." *Id.* at 8661. The district court adhered to this position when charging the jury, emphasizing that the critical issue was whether there was independent activity or "a conscious commitment to a common scheme to fix and raise prices." *Id.* at 9562. In guiding the jury on this issue, the court also stated:

Mercedes-Benz of North America may suggest and recommend, and if the dealer follows independently, there's no problem. It's also true that if Mercedes-Benz persuades, cajoles and teaches or advocates a certain policy, the dealers may independently adopt that policy. But when you start to use words like teach, advocate, persuade and cajole, it seems to me you come a little closer on the line to joint or concerted activity and away on the line from independent activity.

*Id.* at 9565. We cannot say that the court's charge was inconsistent with its position at the charge conference and conclude that appellants were not prejudiced by the charge as given.

### B.

■ Although appellants raise several evidentiary issues we need address only one. Appellants argue that the district court erred in admitting twenty industry publications involving other automobile manufacturers based on the grounds of hearsay, relevancy, and authentication. The documents contained instructions as to service department operations and included labor time guides. We hold appellants' arguments to be without merit.[6]

### 1.

■ It is axiomatic that the hearsay rule does not bar the admission of out-of-

---

**6.** Many of appellees' exhibits were introduced during an evidentiary hearing held following the close of testimony. Appellants, apparently recognizing that at the hearing they did not object to this procedure, *see* app. at 8842, and at one point even invited the judge to rule on the admissibility of exhibits without taking additional testimony, app. at 8941, now insist that the district court's practice was plain error that

was not waived by their failure to object. F.R. Evid. 103(d). We do not agree. The trial judge's decision to consider the evidence after testimony was completed, and thus not to interrupt the jury portion of the trial, was within his discretion. Appellees had listed their exhibits in advance of trial, and therefore appellants were not prejudiced when the documents were not formally introduced until late in the trial.

court declarations that are not offered for the truth of the matters asserted therein. The publications here were offered for the limited purpose of showing industry practice. We reject plaintiffs' argument that this somehow triggered the hearsay exclusionary rule. The district court correctly noted during trial: "They're not presenting this for the truth of it, for the truth that, for example, that there may be a statement in there that we encourage a dispatch system in the repair department. Whether that's true or false, doesn't really make any difference.... The *only thing that makes a difference is they have some kind of system.*" App. at 8898 (emphasis supplied). We are in complete accord with the district court that this was a legitimate nonhearsay use of the challenged evidence.

## 2.

█ The nonhearsay purpose of the documents was relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." F.R.Evid. 401. An essential element of the appellants' case required that they prove that Mercedes conspired with its dealers or engaged in concerted action when the dealers used the Mercedes time guides or followed the operations instructions. The various manufacturers' documents at issue here tended to render appellants' allegations less probable, because a reasonable inference was that use of the time guides occurred due to independent action motivated by competitive forces and industry practice.

## 3.

█ In their brief to this court, appellants indicate that they objected to eleven of the industry documents on authentication grounds. Brief for Appellants at 40–43. Rule 901, F.R.Evid., provides in pertinent part that:

The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence suf-

ficient to support a finding that the matter in question is what its proponent claims.

(b) **Illustrations.** By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule:

(1) **Testimony of witness with knowledge.** Testimony that a matter is what it is claimed to be.

. . . .

(4) **Distinctive characteristics and the like.** Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

We recently noted, in *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916 (3d Cir. 1985), that "circumstantial evidence may, in principle, suffice to authenticate a document. The burden of proof for authentication is slight. 'All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be.'" *Id.* at 9289 (quoting *In re Japanese Electronics*, 723 F.2d 238, 285 (3d Cir.1983), *cert. granted on other grounds*, — U.S. —, 105 S.Ct. 1863, 85 L.Ed.2d 157 (1985)). In *McQueeney*, we determined that the contents of challenged documents themselves can support a claim of authenticity, and in that case relied upon "the specificity, regularity, and official appearance of the documents" as providing sufficient circumstantial evidence. *Id.* at 929. After a careful review of the record here, we have little difficulty concluding that all of the documents were properly authenticated pursuant to Rule 901, either by direct testimony or by the contents of the documents themselves.

Most of the publications were identified by Mr. Gaylon Woods, who testified with knowledge that the materials were what appellees claimed them to be. We have set out in the margin references to that portion

of the record containing the relevant testimony.[7]

Appellants' argument that Woods' testimony was insufficient to authenticate the documents misconceives the nature of a proponent's burden under Rule 901. We rejected a similarly restrictive interpretation of Rule 901 in *United States v. Goichman,* 547 F.2d 778 (3d Cir.1976). In that case, the appellant contended that the district court erred in admitting an incriminating document because there was insufficient evidence linking the document to the appellant. We stated:

> What appellant overlooks is that the showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. *Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility.* Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic....

*Id.* at 784 (emphasis supplied) (citation omitted). Mr. Woods' testimony that the various documents were what Mercedes purported them to be constituted evidence sufficient to sustain a finding in Mercedes favor, and satisfied the admissibility requirement of Rule 901.

As to the remaining challenged documents,[8] we conclude that the distinctive characteristics of these documents constituted sufficient evidence to sustain a finding that they were what Mercedes claimed them to be, and were therefore properly admitted pursuant to Rule 901(b)(4). All of these documents had distinctive characteristics sufficient to overcome the slight authentication admissibility burden. These characteristics included company logos and other trademarks, the professional appearance of the various handbooks and manuals, and the specific nature of the contents of the documents, including their internal consistency.[9] Based on these characteristics, we conclude that there was sufficient circumstantial evidence of their reliability. The district judge correctly determined that "[t]here is no real controversy as to the authenticity of these documents." App. at 10609.15.

### C.

After considering the above and all of the appellants' other allegations of error, we hold that there was no "pattern of errors" in the district court sufficient to require a new trial. The district court therefore did not abuse its discretion in denying appellants' motion for a new trial.

### V.

■ Appellants' final argument on appeal no. 85–1552 is that the district court erred in dismissing portions of the claim

---

**7.** Mr. Woods testified as to D–95 at 5958; D–96 at 5950; D–112 at 5958; D–113 at 5938–42; D–114 at 5934–38; D–205 at 5979 and D–211 at 5978.

**8.** These include D–101, D–102, D–105 and D–207.

**9.** All of the challenged documents, even those identified by Woods, had distinctive characteristics. We specifically note the characteristics of those documents that were admitted notwithstanding the absence of testimony. For example, the Chevrolet Productivity Network (D–101) is a monthly publication that deals specifically with dealership management. The content of this publication is consistent with its topic and the publication's "PRO" logo appears on every page. The Lincoln Mercury Guide (D–102) has a table of contents, at the bottom of which

appears the Ford Motor Company copyright, which corresponds exactly to the text of this exhibit. Next, the Chevrolet Service Seminar (D–105) is an evaluation form directed from Chevrolet to its Jacksonville dealers to assist them in improving customer relations. The Chevrolet logo appears on the letter from Chevrolet accompanying the evaluation form and on the worksheet at the end of the evaluation form. The content of the evaluation form itself is internally consistent, as well as being consistent with the purpose stated in the letter from Chevrolet. Finally, the Mitchell Chassis Flat Rate and Parts Manual (D–207) contains the Mitchell Manuals' copyright on every page and additionally it demonstrates an internal consistency of information from page to page.

relating to purchases of parts and labor from the Mercedes owned store in Hollywood. Because this issue implicates the selection, interpretation, and application of legal precepts, review of this question is plenary. *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 102–03 (3d Cir.1981).

The district court dismissed these portions of the complaint because the plaintiffs were "not representative of this subclass of plaintiffs." App. at 2674. The court apparently based this conclusion on the fact that neither of the named plaintiffs had purchased repairs from the Hollywood dealership. The dismissal was erroneous. If the class representatives did not adequately represent the subclass, the proper remedy was to amend the class certification order or to permit additional plaintiffs to intervene. F.R.Civ.P. 23(d). However, in this case the subclass was adequately represented. The fact that class members obtained repairs at different dealerships does not, without more, create the kind of antagonistic interests that would make the named plaintiffs inadequate class representatives. *See Lewis v. Curtis*, 671 F.2d 779, 788 (3d Cir.1982) (discussing requirements for adequacy of representation under Rules 23.1 and 23(a)(4)).

We have affirmed the district court's judgment in defendant's favor on the labor claim, and its dismissal of the parts claim to the extent that damages are requested. We conclude that our decision is binding to the same extent as to the claims of the "Hollywood class." We so conclude because, in reality, plaintiffs fairly represented the entire class throughout the trial proceedings. However, since the class claim for injunctive relief regarding parts overcharges remains a live controversy, the dismissal of that claim on behalf of the Hollywood members of the plaintiff class must be vacated. We need not decide whether the claims on behalf of the Holly-

wood class members may be barred by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

## VI.

In appeal No. 85–1651 the appellants allege that Mercedes forced its dealers to purchase parts exclusively from Mercedes and, further, that Mercedes and its dealers conspired to fix the price of parts to non-warranty customers at suggested retail prices. They characterize this conduct as a retail price fix. However, appellants based their proof of damages on the amount by which the wholesale price Mercedes charged its dealers exceeded the wholesale price of comparable parts from sources other than Mercedes. By orders dated April 27, 1984, and May 24, 1984, the district court granted summary judgment in favor of the defendants on the damage portion of these claims. App. at 2673, 2798. The court determined that appellants' proof necessarily involved the claim of a pass-on of the wholesale price overcharge from the dealers to class members, and therefore, was barred by precepts announced in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), where the Supreme Court held that an indirect purchaser did not have standing to recover damages for alleged price fixing.

Although appellants alleged retail price fixing, their proffered evidence, as set forth in their pretrial statement, app. at 254–60, focused instead on allegations that Mercedes required dealers to purchase parts exclusively from Mercedes as a prerequisite to franchising, and that this "parts sourcing" requirement resulted in higher prices of parts to the retail class. Their theory of damages was based upon alleged restrictions on the dealers' purchases of parts at wholesale prices.[10] The dis-

---

10. MBNA executes several agreements with its authorized dealers. New dealers first sign a "Dealer Agreement," which includes by reference the "Dealer Agreement Standard Provisions." Each year thereafter, every dealer signs a Dealer Operating Requirements Agreement (hereinafter "DORA"). These franchising documents contain several clauses relating to the supply and pricing of Mercedes-Benz parts. The Dealer Agreement provides as follows:

trict court found that "[i]f plaintiffs here were damaged at all, based on that theory, it is because that overcharge was passed-on to them," *id.* at 2804, and concluded that *Illinois Brick* therefore barred the claim. The district court then certified the *Illinois Brick* question pursuant to 28 U.S.C. § 1292(b), and this court granted a petition to appeal. We agree with the district court's conclusion that *Illinois Brick* bars this claim.

### A.

Our inquiry begins with an analysis of *Illinois Brick.* In that case, the State of Illinois and various local governments sued Chicago area manufacturers of concrete block, claiming a horizontal conspiracy among the block manufacturers to fix the price of their product. Plaintiffs were two distribution levels removed from the manufacturers. Manufacturers sold their blocks to masonry contractors, who used the blocks to build masonry structures; general contractors incorporated those structures into entire buildings, and sold the buildings to plaintiffs. The Court was required to apply to this situation the precepts of *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which had held that a defendant manufacturer could not defend against a Clayton Act § 4 violation by arguing that the plaintiff had "passed on" the alleged overcharge to indirect customers and had therefore not sustained injury. In *Hanover*, the Court held

the defense to be invalid, and determined that direct purchasers are those "injured ... by reason of anything forbidden in the antitrust laws" regardless of their subsequent sale of the goods. *Id.* at 488–89, 88 S.Ct. at 2228.

In short, *Hanover* dealt with charges passed on by the plaintiffs. *Illinois Brick* dealt with charges passed to the plaintiffs from the defendants by intermediate sellers; the plaintiffs were the final purchasers in the distribution chain. In *Illinois Brick* the Court stated that only the "overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of [§ 4]." 431 U.S. at 729, 97 S.Ct. at 2066. Two harmful consequences, said the Court, prohibit use of a pass-on theory by plaintiffs: the possibility of inconsistent adjudication or multiple liability for defendants; and the "massive evidence and complicated theories" required to apportion damages among all potential plaintiffs. *Id.* at 730, 741, 745, 97 S.Ct. at 2066, 2074. The Court believed that the increased litigation costs likely to result would discourage the private enforcement of the antitrust laws. *Id.* at 746, 97 S.Ct. at 2075. Recognizing that "these difficulties and uncertainties will be less substantial in some contexts than others," the Court nevertheless clearly "reject[ed] ... attempts to carve out exceptions to the *Hanover Shoe* rule for particular types of markets." *Id.* at 743–44, 97 S.Ct. at 2073.

"MBNA will sell to the Dealer and the Dealer will buy from MBNA Mercedes-Benz passenger cars, parts, and products and assume the obligation of selling and promoting the sale of Mercedes-Benz passenger cars, parts, and products in [a designated] nonexclusive area." App. at 10,612. Paragraph 11(A) of the Standard Provisions provides that "MBNA shall sell Mercedes-Benz parts to the Dealer at such prices and upon such terms as may be established from time to time by MBNA." *Id.* at 10,654. Finally, the DORAs from 1970 to the present, section V(G), provide, "Dealer will price its parts to customers fairly and will be guided by retail prices suggested by Mercedes-Benz of North America, Inc." *Id.* at 11,643.

Appellants alleged that these clauses taken together represent an express agreement be-

tween MBNA and each of its dealers to fix the price of parts to the consumer, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. In addition, they alleged that price-fixing agreements as to parts were entered into between MBNA and its dealers at various meetings between MBNA employees and dealers, at which time parts pricing was discussed. Also, they argued that the monitoring of dealer parts prices by MBNA field representatives amounts to the enforcement of a resale maintenance scheme. Finally, they alleged that MBNA required dealers to purchase Mercedes-Benz parts only from MBNA, and that this "parts sourcing" requirement had the effect of raising the price of parts to consumers.

In doing so, the Court took a realistic view of the symbiotic relationships present in the actual world of business. The Court recognized that direct purchasers sometimes may refrain from bringing a treble-damages suit for fear of disrupting relations with their suppliers, but decided that:

> [U]ntil there are clear directions from Congress to the contrary, ... the legislative purpose in creating a group of " 'private attorneys general' " to enforce the antitrust laws under § 4, ... is better served by holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed a part of it.

*Id.* at 746, 97 S.Ct. at 2075.

Because appellants did not purchase directly from Mercedes, *Illinois Brick* seems to clearly bar their claims against Mercedes. Appellants, however, present several arguments against this result.

### B.

First, appellants contend that *Illinois Brick* does not apply to vertical conspiracies, as here. However this is no longer an open question in this court. Our decisions in *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 967–68 (3d Cir. 1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984); *Edward J. Sweeny & Sons, Inc. v. Texaco*, 637 F.2d 105, 122 (3d Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); and *Mid-West Paper Products Co. v. Continental Group*, 596 F.2d 573, 578–80 (3d Cir.1979), all applied *Illinois Brick* to vertical conspiracies.

### C.

Alternatively, appellants argue that this court should carve out a narrow exception to *Illinois Brick* in vertical conspiracies where the intervening parties in the distribution process are named as co-conspirators (a so-called "co-conspirator exception"). *E.g., State of Arizona v. Shamrock Foods Co.*, 729 F.2d 1208 (9th Cir. 1984). We decline to recognize this exception where, as here, the alleged co-conspirators are not also joined as co-defendants.

We did not reach this precise issue in *Merican* because the plaintiffs did not allege that the middleman they purchased from was a co-conspirator. 713 F.2d at 968 n. 22. *Merican* is nonetheless instructive. There, we held that the crucial inquiries in determining whether the *Illinois Brick* bar applies are whether there exists a "possibility of duplicative suits and [a] possibility for overly-complex damage claims if a damage suit is allowed." *Id.* at 966. Because both of these concerns are present, we cannot permit an exception to the *Illinois Brick* rule under these circumstances.

#### 1.

The risk of duplicative recovery exists because the Mercedes dealers are not parties to this action. No appellate court including the Ninth Circuit itself, has followed the *Shamrock Foods* dicta [11] where the middlemen dealers are not joined as co-defendants along with the manufacturer. *See In re Midwest Milk Monopolization Litigation*, 730 F.2d 528, 529 (8th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984); *In re Coordi-*

---

**11.** In *Shamrock Foods* the court found that *Illinois Brick* did not apply because no risk of duplicative recovery existed. 729 F.2d at 1213. In that case the plaintiff consumers had amended their damage theory to allege only retail price fixing, and stated that none of the damages claimed were attributable to inflated wholesale prices. *Id.* at 1211. The Ninth Circuit stated that "[i]n these circumstances, *Illinois Brick* is no bar since there would be no wholesale overcharge to be passed on to the consumers." *Id.* Therefore, any co-conspirator exception that *Shamrock Foods* may purport to establish was merely dicta.

The same distinction also applies to another case which purports to recognize a co-conspirator exception, *Fontana Aviation, Inc. v. Cessna*, 617 F.2d 478 (7th Cir.1980). There the court also found that the case did "not fit within the *Illinois Brick* mold of an indirect purchaser suing the manufacturer for an overcharge," *id.* at 481, because the plaintiff also had alleged antitrust injuries arising from its capacity as a competitor with the defendant in a related product line, and therefore damages were distinct from a passed on overcharge. The court reasoned that "the allegations ... should be judged as a whole and not separately." *Id.*

*nated Pretrial Proceedings*, 691 F.2d 1335, 1341–42 (9th Cir.1982), *cert. denied*, 464 U.S. 1068, 104 S.Ct. 972, 79 L.Ed.2d 211 (1984); *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1163 (5th Cir.1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). Even if Mercedes and its dealers are deemed to have been co-conspirators and it is decided that the dealers suffered no damages,[12] these determinations would not have collateral estoppel effect in a subsequent suit by any dealer against Mercedes. Accordingly, if the distributor is not joined in the customers' suit the risk of duplicative liability condemned by *Illinois Brick* remains.

### 2.

Nevertheless, appellants hypothesize that Mercedes could defend such a suit by arguing that the dealers' "complete involvement" in the conspiracy precluded recovery. *See THI–Hawaii v. First Commerce Financial Corp.*, 627 F.2d 991 (9th Cir.1980). The district court rejected this argument. It determined "the evidence ... of dealer participation in the alleged conspiracy to fall substantially short of the level of participation that might trigger the *in pari dilecto* defense under *Perma-Life* [*Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968)]*." App. at 2808. We agree. In *Perma Life*, dealers who had operated "Midas Muffler Shops" sued Midas, alleging Midas had conspired with its subsidiaries and certain individuals to violate § 1 of the Sherman Act and § 3 of the Clayton Act. In the lower courts, Midas successfully asserted the *in pari dilecto* defense. It argued that because the plaintiff dealer had signed the franchising agreements, it was equally guilty of the

anticompetitive behavior. Yet the Supreme Court reversed, holding that "the doctrine of *in pari dilecto* is not to be recognized as a defense to an anti-trust action." 392 U.S. at 140, 88 S.Ct. at 1085. The Court stated that it need not decide whether a "truly complete involvement" could ever bar an antitrust action. The Court noted that the franchising agreements required Midas dealers to purchase their parts only from Midas, and to carry Midas' full line of parts; that these requirements were not in a dealer's self-interest; and that they demonstrated that the illegal scheme had been thrust upon them. *Id.* at 140–41, 88 S.Ct. at 1985.

We are not persuaded that Mercedes is now totally insulated from an allegation by dealers against it on the precise theory of *Perma-Life*. With the district court we agree that such a possibility resembles more the precise holding of *Perma-Life*, rather than the suggested exception of "total involvement" offered in that case as dicta. *See also American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1255 (3d Cir.1975). Furthermore, unless the alleged co-conspirators are joined as co-defendants, any determination in this court that a "complete involvement" defense is or is not available would not be binding in a later action.

Therefore, even assuming appellants' conspiracy allegations are true, we believe that Mercedes would still be subject to the risk of suits by the dealers. To permit appellants in this case to pursue this action would clearly raise the possibility of duplicative recoveries against Mercedes, and thus brings this case squarely within the proscription of *Illinois Brick*.

**12.** We note, however, that appellants' theory of damages does include injury to the dealers upon which an antitrust claim could be based. Appellants theorize that Mercedes restricted its dealers to purchasing repair parts only from Mercedes and also charged them inflated prices for those parts. This theory, of necessity, contemplates that certain dealers could maintain actions against Mercedes alleging a conspiracy between Mercedes and their fellow dealers to fix prices. This, of course, would subject Mer-

cedes to duplicative suits. In *Merican* we affirmed the dismissal of a purchaser's claim for this very reason. We stated that the distributors could at the very least claim damages in the form of decreased profit margins, even if demand was unaffected by the higher prices—a condition that may not be present here. *Merican*, 713 F.2d at 969. *See also Sweeney*, 637 F.2d at 110 (claim by distributor alleging conspiracy between co-distributor and manufacturer).

### 3.

Appellants also argue that their theory of damages would not be massively complex, and that therefore the second reason for the *Illinois Brick* bar does not apply here. We disagree. Their theory of recovery would require at least a damages calculation showing the differential based on Mercedes' prices as compared to other market prices. Their theory requires the use of various formulas. Individual dealer mark-ups, which vary, *see, e.g.,* app. at 14042–43, 14046, would require factoring out from Mercedes liability, further complicating the calculations.

### 4.

Our holdings in *Edward J. Sweeney, Midwest Paper,* and *Merican* refuse to undercut *Illinois Brick.* We adhere to that philosophy here and are not persuaded to carve out a co-conspirator exception where the alleged co-conspirators are not joined as co-defendants. We therefore ally ourselves with the holdings of *In re Midwest Milk Monopolization Litigation,* 730 F.2d 528, 529 (8th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984), and *In re Beef Industry Antitrust Litigation,* 600 F.2d 1148, 1163 (5th Cir.1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). We conclude that the district court did not err in granting summary judgment to Mercedes on the parts pricing claim and therefore affirm the district court's holding on the question certified under 28 U.S.C. § 1292(b).

### VII.

In the appeal at No. 85–1552 we will vacate the order of the district court dismissing the portions of the complaint relating to the Hollywood customers and, treating them as members of the class will affirm the judgment of the district court in all respects. In the appeal at No. 85–1651, certified under 28 U.S.C. § 1292(b), we will affirm the district court order that constituted the basis of the certified question and hold that the district court did not err in determining that the teachings of *Illinois*

*Brick* act as a bar to recover damages for the pricing of Mercedes parts.