OPINION
GARTH, Circuit Judge:
The instant appeal requires us to decide whether the plaintiff-clients, whose attorneys purchased photocopies of the clients’ hospital records for the purpose of prosecuting their clients’ personal injury and medical malpractice claims, have standing to bring an antitrust action against the sellers of the photocopies. We hold that such clients lack standing to bring a treble-damages claim because they are not “direct purchasers,” as required by Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). However, we also hold that these clients are not barred from seeking injunc-tive relief under section 16 of the Clayton Act.
*845 I.
Plaintiffs Mary Ruth McCarthy,[1] Guy Col-ville, Edward Ormsby, Carmen Tomasetti[2] and Joseph Hoffman filed a three-count complaint, on January 19, 1993, against five hospitals (the “Hospital defendants”)[3] and five copy-service companies (the “Copy Service defendants”).[4] The complaint asserted violations of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2 (count I);[5] violations of the Racketeering, Influence, and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962 and 1964 (count II)[6]; and violations of the civil rights laws, 42 U.S.C. § 1983 (count III). The complaint and amended complaint sought injunctive relief, money damages, class certification and attorneys’ fees. In essence, plaintiffs allege that the Hospital Defendants and the Copy Service Defendants conspired to charge excessive prices for photocopies of medical records requested by patients or former patients.
Each of the named plaintiffs, at some time within four years before filing the instant action, were patients at hospitals owned by the Hospital Defendants. Each plaintiff had retained either Matty & Ferroni (“M & F”), a New Jersey law firm, or Fell & Spalding (“F & S”), a Philadelphia firm, to file a personal injury or medical malpractice claim on his or her behalf. In each ease, after the particular plaintiff had signed a medical consent form authorizing the appropriate hospital to release his or her medical records, the plaintiffs attorney requested photocopies of the client’s hospital records. The copy service company, in each case, billed the attorney directly.[7]
Each of the five plaintiffs had entered into a contingent-fee agreement with either M & F or F & S. With the exception of McCarthy, none of the plaintiffs were obligated under the relevant retainer agreement to reimburse the law firm for costs, including the photocopying expenses at issue, unless a monetary recovery in favor of the particular client was *846 obtained.[8] McCarthy’s agreement with F & S, on the other hand, provided that “[t]he absence of a recovery shall not relieve [McCarthy] from the obligation of paying court costs and other proper litigation and investigative costs.”[9] App; 498. However, Stephen R. Bolden, a partner at F & S, admitted in an affidavit that despite the contractual language, in actual practice, the firm never sought reimbursement for advanced costs where representation of the client did not lead to a recovery:
Although under the express language in this Contingent Fee Agreement, Fell & Spalding is contractually entitled to seek reimbursement from a client even where a representation of that client has not led to the recovery of funds; as a matter of actual practice, where Fell & Spalding has been unsuccessful in obtaining a recovery of funds by way of settlement or otherwise ... Fell & Spalding has not sought reimbursement for the costs incurred in copying a client’s hospital records....
App. 526.[10]
Each of the Hospital Defendants had entered into a contract with one of the Copy Service Defendants, granting the Copy Service Defendant the exclusive right to photocopy hospital records requested by patients or other members of the public entitled to such records. Under the contract, the copy-service company agreed to photocopy any medical records requested by patients or other requestors. The sole remuneration received by the Copy Service Defendants derived from the copying charges paid by the requestors. App. 685, 692, 694, 698, 701.
Patients or their attorneys were charged $1 per page for copies of medical records. In addition, they also typically paid a retrieval fee, which was remitted to the hospital; an “administrative” or “basic” fee (i.e. a flat fee unrelated to the number of copies), which was retained by the copy-service company; and postage and handling fees.
Certain “favored” requestors were charged a reduced rate[11] or no fee at all.[12] The Hospital Defendants set the schedule of charges, designating the requestors who would or would not be charged. Typically, sixty percent or more of the requests for hospital records were nonbillable.
Plaintiffs claim that the practice of subsidizing certain requestors while charging patients or their agents an inflated fee violated *847 a Pennsylvania regulation, which provides in relevant part:
Patients or patient designees shall be given access to or a copy of their medical records, or both.... Upon the death of a patient, the hospital shall provide, upon request, to the executor of the decedent’s estate or, in the absence of an executor, the next of kin responsible for the disposition of the remains, access to all medical records of the deceased patient. The patient or the patient’s next of kin may be charged for the cost of reproducing the copies; however, the charges shall be reasonably related to the cost of making the copy.
28 Pa.Code § 115.29 (emphasis added).
After plaintiffs filed an amended complaint, the defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court, by order dated August 5, 1993, denied defendants’ motion to dismiss counts I (antitrust) and II (RICO) but granted the motion to dismiss count III (civil rights).
Subsequently, on April 4, 1994, plaintiffs moved to certify the case as a class action. On November 18, 1994, in a Memorandum and Order, the district court denied plaintiffs’ motion for class certification.
On April 1, 1994, defendant Hahnemann filed a motion for partial summary judgment on count I (the antitrust claim), which was eventually joined by all of the defendants except Smart. The district court denied the motion for partial summary judgment in an order dated May 5,1994.
Subsequently, Hahnemann moved for reconsideration. On July 8, 1994, the district court granted Hahnemann’s motion for reconsideration and granted summary judgment on count I in favor of all defendants, holding that the plaintiffs lacked standing because they were not “direct purchasers” of the hospital records, within the meaning of Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).
On December 12, 1994, all of the defendants joined in a motion for summary judgment on the remaining RICO claim, on the theory that antitrust standing principles applied equally in the RICO context. On December 29, 1994, the district court granted summary judgment to all defendants on count II, thus disposing of all three counts of the complaint. Plaintiffs timely filed the instant appeal.
II.
The district court had jurisdiction over plaintiffs’ antitrust and RICO claims under 15 U.S.C. § 15; 18 U.S.C. § 1964; and 28 U.S.C. § 1331. We have appellate jurisdiction over the district court’s grant of summary judgment in favor of defendants under 28 U.S.C. § 1291.
The issue of antitrust standing is a legal issue, over which we exercise plenary review. In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1164 (3d Cir.1993), cert. dismissed, — U.S. -, -, 114 S.Ct. 625, 652, 126 L.Ed.2d 589, 610 and cert. denied, — U.S. -, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994). We also exercise plenary review of a district court’s grant of summary judgment, applying the same standards applied by the district court. Rosen v. Bezner, 996 F.2d 1527, 1530 (3d Cir.1993); Koshatka v. Philadelphia Newspapers, Inc., 762 F.2d 329, 333 (3d Cir.1985).
Summary judgment is proper only where “there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine dispute exists as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Moreover, any inferences to be drawn must be viewed in the fight most favorable to the party opposing summary judgment. Id. at 247, 106 S.Ct. at 2509-10; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).
III.
A.
Almost twenty years ago, the Supreme Court articulated the so-called “direct pur *848 chaser” rule, an antitrust standing doctrine that barred downstream indirect purchasers from bringing an antitrust claim. See Illinois Brick Co. v. Illinois, 431 U.S. 720, 744, 97 S.Ct. 2061, 2073-74, 52 L.Ed.2d 707 (1977). Recognizing that allowing an indirect purchaser to assert an antitrust claim for the portion of an overcharge “passed on” to the indirect purchaser would create an intractable problem of tracing and apportioning damages between different purchasers in the chain of distribution, the Court chose to avoid this morass by enunciating a bright-line rule that only the purchaser immediately downstream from the alleged monopolist may bring an antitrust action. Id.
Almost a decade before Illinois BHck, the Supreme Court laid the foundation for the “direct purchaser” standing requirement in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968), which rejected a “pass-on” defense proffered by an antitrust defendant who claimed that the plaintiff was not entitled to treble damages for costs “passed on” to its customers. Id. at 487-89, 88 S.Ct. at 2228-29. In Hanover Shoe, the plaintiff shoe manufacturer, Hanover Shoe, Inc., brought suit under section 4 of the Clayton Act against United Shoe Machinery Corp. (USMC), a manufacturer and distributor of shoe machinery, alleging that USMC had monopolized the shoe machinery industry by refusing to sell its equipment and requiring users to lease the equipment instead. Id. at 486-87, 88 S.Ct. at 2227-28. USMC argued that Hanover Shoe had been able to recoup its losses by charging its customers more for the shoes and thus did not suffer any cognizable injury because it had passed on the allegedly illegal overcharge to its customers. Id. at 487-88, 88 S.Ct. at 2228.
The Court rejected USMC’s pass-on theory, explaining that entertaining such a defense would raise difficult proof issues as to the amount of the overcharge passed on and whether, absent the overcharge, Hanover Shoe could have raised its prices. Id. at 489-94, 88 S.Ct. at 2228-32. The Court also expressed concern that downstream buyers would have only “a tiny stake in a lawsuit” and thus little incentive to prosecute a private antitrust claim. Id. at 494, 88 S.Ct. at 2232. The Court reasoned that allowing a pass-on defense would diminish private antitrust enforcement and thereby increase the likelihood that violators of antitrust laws would escape liability. Id.
In Illinois BHck, the Supreme Court addressed the corollary to the problem they faced in Hanover Shoe: offensive use of the pass-on theory by indirect purchasers to recover treble damages for injuries “passed on” to them by intermediaries in the distribution chain. Illinois BHck involved a suit brought by the State of Illinois and 700 local governmental entities against a group of concrete block manufacturers, who had allegedly engaged in a price-fixing conspiracy. 431 U.S. at 726-27, 97 S.Ct. at 2064-65. The State and the local municipalities had hired general contractors for several large construction projects in the Chicago area. Id. at 726, 97 S.Ct. at 2064-65. The general contractors, in turn, had subcontracted the masonry work to certain masonry contractors who had purchased the allegedly overpriced blocks from the conspirators. Id. The State of Illinois and the local governmental entities were thus indirect purchasers of concrete block, two levels down the distribution chain from the manufacturers. Id.
Illinois and the other governmental entities claimed that part or all of the overcharge had been passed on by the subcontractors and general contractors. Id. at 727, 97 S.Ct. at 2065. As a result, according to the plaintiffs, they had overpaid for the concrete block by more than three million dollars. Id. The Court dismissed the claim, holding that indirect purchasers may not sue for antitrust damages. Id. at 736, 97 S.Ct. at 2069-70.
The Court in Illinois BHck explained that the outcome was dictated by Hanover Shoe and that principles of judicial consistency compelled the Court to prohibit the offensive use of a pass-on theory where it had disallowed the defensive use of the pass-on doctrine in a similar factual situation. Id. at 730, 97 S.Ct. at 2066-67. The Court further explicated that permitting the latter while disallowing the former would create a risk of multiple liability: “A one-sided application of Hanover -Shoe substantially increases the *849 possibility of inconsistent adjudications — and therefore of unwarranted multiple liability for the defendant — by presuming that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the other plaintiff...Id.
The State posited that the danger of dupli-cative recovery could be avoided by apportioning the damages attributable to the concrete-block manufacturers’ wrongful conduct. The Court, however, rejected the State’s argument that indirect purchasers should be allowed to recover the fraction of the overcharge “passed on” to them, explaining:
Permitting the use of pass-on theories ... essentially would transform treble-damages actions into massive efforts to apportion the recovery among all potential plaintiffs that would have absorbed part of the overcharge — from direct purchasers to middlemen to ultimate consumers. However appealing this attempt to allocate the overcharge might seem in theory, it would add whole new dimensions of complexity to treble-damages suits and seriously undermine their effectiveness.
Id. at 737, 97 S.Ct. at 2070.
Subsequently, in Kansas v. UtiliCorp United, Inc., 497 U.S. 199, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990), the Court reaffirmed its commitment to the “direct purchaser” rule, refusing to carve out an exception to Illinois Brick for situations where the full cost of the product (and hence one hundred percent of any overcharge) had been passed on to the indirect purchaser. Id. at 216, 110 S.Ct. at 2816-17. In UtiliCorp, the States of Kansas and Missouri, acting as parens patriae, brought an antitrust action on behalf of their residents, claiming that a pipeline company and five gas producers had conspired to inflate the price of the natural gas that they supplied to public utilities. Id. at 204, 110 S.Ct. at 2810-11. These utilities, according the States, had passed on the full amount of the overcharge to their residential and commercial customers. Id.
Kansas and Missouri argued that the concerns voiced in Illinois Brick, namely the difficulties of apportionment, the risk of multiple recovery and the diminution of incentives for private antitrust enforcement, were absent because regulated public utilities pass on one hundred percent of their costs to consumers, who are the ones that actually suffer antitrust injury. The Court forcefully rejected that argument, opining that “[a]l-though the rationales of Hanover Shoe and Illinois Brick may not apply with equal force in all instances, we find it inconsistent with precedent and imprudent in any event to create an exception for regulated public utilities.” Id. at 208, 110 S.Ct. at 2812-13.
We have applied Illinois Brick’s antitrust standing principle on several occasions. For example, in Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573 (3d Cir.1979), we relied on Illinois Brick in holding that indirect purchasers of consumer bags could not maintain a treble-damages suit against the manufacturers of such bags. Id. at 575. In Mid-West Paper, the defendants manufactured so-called consumer bags — single or multilayered paper bags used for packaging pet foods, coffee, cookies, chemicals and the like. Id. The plaintiff-grocery stores purchased either empty consumer bags (which they used to package their own products) from middlemen and wholesalers or products that were pre-pack-aged in consumer bags for resale to their customers. Id. at 575-76. After reviewing the teachings of Illinois Brick, we determined that the “direct purchaser” rule barred the treble-damages claims of all of the plaintiffs (except Mid-West Paper Products Company, which had purchased consumer bags directly from a subsidiary of one of the defendants). Id. at 575.
Similarly, in Merican, Inc. v. Caterpillar Tractor Co., 713 F.2d 958 (3d Cir.1983), cert. denied, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984), non-factory-authorized dealers, who had purchased electrical generators from authorized dealers for resale in foreign markets, alleged that Caterpillar, the manufacturer of these electrical generators, had illegally imposed a penalty on its dealers to prevent or discourage the dealers from selling Caterpillar products to independent marketers. Id. at 960. The district court held that the plaintiffs had standing under Illinois Brick because the nonfactory-autho- *850 rized dealers were the “direct target[s] of an unlawful conspiracy.” Id. at 962. We reversed, holding that an indirect purchaser, even if a “direct target” of an antitrust conspiracy, lacked standing under Illinois Brick. Id. at 966.
Likewise, in Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918 (3d Cir.1986), Mercedes repair customers claimed that Mercedes dealers, who were required to purchase parts exclusively from Mercedes at artificially inflated prices, had passed on those costs to retail customers. Id. at 928-30. Citing Illinois Brick, we held that retail customers were indirect purchasers and therefore lacked antitrust standing. Id. at 930.
Most recently, in Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425 (3d Cir.1993), we held that only the direct purchaser of an aircraft, and not a downstream buyer or assignee, had standing to pursue an antitrust claim. Id. at 439. We emphasized that “any exception to the direct purchaser rule would be inappropriate in this case for the same reasons that the Supreme Court held an exception would be inappropriate in UtiliCorp.’’ Id.
B.
Plaintiffs argue that the Supreme Court has receded from Illinois Brick’s “direct purchaser” rule. Specifically, plaintiffs contend that the “direct purchaser” requirement has been displaced by the multi-factor approach to antitrust standing outlined in Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) [hereinafter “AGC ’’].
In AGC, the plaintiff-unions, representing California construction workers, sued an association of employers with whom the unions had entered into collective bargaining agreements. Id. at 522-24, 103 S.Ct. at 900-01. The complaint alleged that the association and its members had coerced certain landowners and other contractors to hire nonunion labor. Id.
In determining whether the plaintiff-unions had standing to sue under section 4 of the Clayton Act, the AGC Court employed a five-part analytical framework, which encompassed the following considerations: (1) the causal connection between the antitrust violation and the harm to the plaintiff (including whether the defendant intended to cause that harm), id. at 537,103 S.Ct. at 908; (2) whether the “nature” of the plaintiffs alleged injury is “of the type that the antitrust laws were intended to forestall,” id. at 538, 103 S.Ct. at 909; (3) the directness or indirectness of the asserted injury, id. at 541, 103 S.Ct. at 910; (4) the existence of more direct victims of the alleged injury (i.e. whether the plaintiff is the party most likely to seek redress of the antitrust violation), id. at 542, 103 S.Ct. at 910-11; and (5) the potential for duplicative recovery or complex apportionment of damages, id. at 543^14,103 S.Ct. at 911-12. The AGC five-factor framework was an attempt by the Court to synthesize and clarify the confusing collection of the then-extant antitrust-standing rules.[13]
Contrary to plaintiffs’ intimation, however, the AGC Court neither overruled Illinois Brick nor limited its application. Indeed, the AGC Court cited Illinois Brick with approval. See id. at 544-45, 103 S.Ct. at 911-12. Moreover, factors four and five in the AGC framework echo Illinois Brick’s concerns. *851 In our view, AGC incorporates, rather than repudiates, the principles of Illinois Brick.[14]
Plaintiffs assert, however, that the absolute bar of the “direct purchaser” rule has been supplanted by AGC’s balancing approach. In support of this contention, plaintiffs cite to certain passages from our opinion in In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144 (3d Cir.1993), cert. dismissed, — U.S.-,-, 114 S.Ct. 625, 652, 126 L.Ed.2d 589, 610, and cert. denied, — U.S. -, 114 S.Ct. 921, 127 L.Ed.2d 215 (1994), wherein we adumbrated that “indirect purchaser status is [not necessarily] the death knell of [an antitrust] claim....”. Id. at 1168. In Lower Lake Erie, several steel companies, dock companies and trucking companies filed civil actions in federal district court, alleging that the defendant railroad companies serving the lower Lake Erie industrial region had conspired to monopolize the transportation and handling of iron ore in the region. Id. at 1151,1152.
In a bifurcated trial, the liability jury found against Bessemer and Lake Erie Railroad Company (BL & E), the sole remaining defendant,[15] and in favor of all plaintiffs but one; and the damages jury awarded all but one claim for damages. Id. at 1151. On appeal, we applied AGC and affirmed the district court’s denial of BL & E’s motion to dismiss for lack of standing and the district court’s denial of BL & E’s motion for judgment n.o.v. Id.
Plaintiffs here contend that Lower Lake Eñe requires that we set aside the district court’s grant of summary judgment and remand for a determination of standing pursuant to the AGC factors. We disagree.
Loiver Lake Eñe is fully distinguishable. In Lower Lake Eñe, we found that the plaintiffs’ claims did not involve “the particular kind of double recovery Illinois Brick sought to prevent.” Id. at 1169.
By contrast, all of the policy concerns expressed in Illinois Bñck are implicated in the present case. First, there is considerable risk that the Hospital defendants and Copy Service defendants would be exposed to multiple liability. Although plaintiffs’ attorneys here have chosen not to sue the defendants directly, it is probable that lawyers who themselves purchase photocopies of them clients’ hospital records would bring treble-damage claims against the Hospital defendants and the Copy Service defendants in the future. Indeed, both the district court and this court inquired as to why the instant complaint had not been amended to substitute the attorneys as plaintiffs. No satisfactory answer was given. Hence, if we were to deny the defendants the protection of the “direct purchaser” rule, they could potentially be held liable to both the clients and the attorneys representing the clients.
Furthermore, this lawsuit involves apportionment problems perhaps more complex than those implicated in Illinois Bñck. Because the costs of the photocopies are only passed on to the client, if the costs are passed on at all, on a contingent basis, the district court would be faced with complex statistical calculations as to the percentage of photocopying costs borne by the attorneys as compared to the costs borne by their clients. *852 In addition, the district court would have to ascertain the degree to which contingent fees charged to successful plaintiffs includes a recoupment of photocopying costs not charged to losing plaintiffs.
Under these circumstances, plaintiffs cannot escape the absolute bar of the “direct purchaser” rule. In order to survive summary judgment, plaintiffs must establish that the clients, and not their attorneys, are the direct purchasers of the hospital-record photocopies. On this record, no such proof exists.
C.
Plaintiffs argue that they, and not then- lawyers, are the direct purchasers of the hospital record photocopies.[16] Plaintiffs contend that their attorneys merely acted as their agents in purchasing the photocopies. Citing In re Toilet Seat Antitrust Litigation, 1977-2 Trade Cases ¶ 61,601, 1977 WL 1453 (E.D.Mich.1977), plaintiffs posit that purchases made by an agent on behalf of the agent’s principal do not come within the scope of the “direct purchaser” rule.
We are unpersuaded by plaintiffs’ argument and find In re Toilet Seat Antitrust Litigation, the single case relied upon by the plaintiffs in support of their agency theory, to be inapposite. That case involved an alleged conspiracy by toilet seat manufacturers to fix the price of wood-flour toilet seats. See In re Toilet Seat Antitrust Litig., 387 F.Supp. 1342, 1343 (J.P.M.L.1975). One of the plaintiffs, Harvey Lumber Company, purchased toilet seats through a purchasing agent, Biddle Purchasing Company, which actually placed the order for the toilet seats at a price approved by Harvey. Biddle received a flat monthly fee, unrelated to the quantity of toilets ordered, and kept no inventory. In re Toilet Seat Antitrust Litigation, 1977-2 Trade Cases ¶ 61,601, at 72,496. The district court concluded that under these limited circumstances, Harvey was a direct purchaser of the toilet seats and had standing to bring an antitrust claim.[17] Id. at 72,496-97.
In the present case, in contrast, none of the plaintiffs retained their lawyers to act as mere purchasing agents whose sole objective and function was to buy photocopies for the clients. Rather, each client hired his or her attorney to file a lawsuit on his or her behalf and to protect the client’s legal interests. Moreover, a fair reading of the record reveals that the lawyers purchased the photocopies for their own use in representing their clients. The attorneys, and not the clients, were undeniably the direct purchasers of the photocopies.
*853 Furthermore, the fact that the costs of the photocopies were passed on to the client on a dollar for dollar basis (at least where the attorney obtained a recovery on behalf of the client) is not dispositive.[18] Indeed, the subcontractors in Illinois Brick and the utility companies in UtiliCorp passed on their costs to the plaintiffs in those respective cases; yet the Supreme Court deemed this fact insufficient to confer standing to the indirect-purchaser plaintiffs in those cases.
Plaintiffs attempt to distinguish these precedents by characterizing the middlemen in those cases as “independent contractors.” Plaintiffs take the position that the attorneys in the present ease, in contrast, are agents and not independent contractors.
It is, of course, beyond cavil that the attorney-client relationship is an agent-principal relationship. However, attorneys are also independent contractors as well as agents. See Restatement (2d) Agency § 14N (1958) (“One who contracts to act on behalf of another and subject to the other’s control except with respect to his physical conduct is an agent and also an independent contractor.”); id. § 14N comment a (“[MJost of the persons known as agents, that is, brokers, factors, attorneys, collection agencies, and selling agencies are independent contractors _”) (emphasis added); 41 Am.Jur.2d Independent Contractors § 4 (1995) (“[F]or example, attorneys at law ... and other similar persons ... are agents, although as to their physical activities they are independent contractors ....”) (emphasis added); see also Commonwealth v. Minds Coal Mining Corp., 360 Pa. 7, 60 A.2d 14, 20 (1948) (adopting Restatement definitions of independent contractor).
An agent may be either an independent contractor or a servant (or employee in modern day parlance). See Restatement (2d) Agency § 2 comment b (1958) (“An agent who is not a servant is, therefore, an independent contractor when he contracts to act on account of the principal.”). Therefore, the relevant inquiry here is not whether a principal-agent relationship exists between clients and their attorneys, but whether attorneys are independent contractors or mere employees. Although there are a number of factors relevant to this inquiry, see Restatement (2d) of Agency § 220 (1958), the most important factor is the degree of control exercised by the principal:
The legal distinction between an employee and an independent contractor is so well established as to require little, if any, discussion. The characteristics of the former relationship is that the master not only controls the result of the work but has the right to direct the way in which it shall be done, whereas the characteristic of the latter is that the person engaged in the work has the exclusive control of the manner of performing it, being responsible only for the result.
Feller v. New Amsterdam Cas. Co., 363 Pa. 483, 70 A.2d 299, 300 (1950). See also Moon Area Sch. Dist. v. Garzony, 522 Pa. 178, 560 A.2d 1361, 1367 (1989); Hammermill Paper Co. v. Bust Eng’g Co., 430 Pa. 365, 243 A.2d 389, 392 (1968).
It is clear that attorneys exercise “exclusive control of the manner of performing [their legal work], being responsible [to the client] only for the result.” Feller, 70 A.2d at 300.
Furthermore, plaintiffs here are not even directly hable for the cost of the photocopies. Except for McCarthy, plaintiffs are liable only if their attorneys succeed in achieving a recovery on their behalf. Indeed, three of the contingent-fee agreements do not impose a separate charge for litigation costs; rather, the attorneys are reimbursed out of their percentage share of the settlement or award.
In McCarthy’s ease, although the retainer agreement does indicate that she is responsible for costs irrespective of the outcome, her attorney acknowledged that in actual practice, his law firm never charged clients unless the firm obtained a recovery. Furthermore, McCarthy faces another insurmountable ob *854 stacle: her attorney never paid the photocopying charges but rather obtained the needed copies from opposing counsel. Therefore, McCarthy (and indeed, even her attorney) cannot show any injury — much less antitrust injury.
Based on these undisputed facts, we must conclude that the clients are not direct purchasers.[19] And unless an exception to the “direct purchaser” principle applies here, the plaintiffs have no standing to assert their antitrust claim under count I.
D.
Plaintiffs argue, in the alternative, that Illinois Brick does not apply here because they fall within the “co-conspirator” exception to the direct purchaser rule. Citing to Link, 788 F.2d at 918, and In re Brand Name Prescription Drugs Antitrust Litigation, 867 F.Supp. 1338 (N.D.Ill.1994), plaintiffs advance the proposition that indirect buyers have standing to bring an antitrust claim against defendants who are co-conspirators in a vertical antitrust conspiracy. To the extent that these cases recognize a co-conspirator exception, however, we hold that plaintiffs have failed to establish the applicability of such an exception to the facts at hand.
Preliminarily, we reject plaintiffs’ reading of Link as establishing an exception to Illinois Brick where the middlemen, from whom the plaintiffs made purchases, participated in a vertical antitrust conspiracy. To the contrary, in Link, we expressly refused to adopt such an exception where the alleged co-eon-spirators immediately upstream were not also joined as codefendants:
Alternatively, appellants argue that this court should carve out a narrow exception to Illinois Brick in vertical conspiracies where the intervening parties in the distribution process are named as eo-eon-spirators (a so-called “co-conspirator exception”). We decline to recognize this exception where, as here, the alleged co-conspirators are not also joined as co-defendants.
Link, 788 F.2d at 931 (citations omitted) (emphasis added).
Similarly, in Brand Name, although the district court did allow the plaintiff retailers of pharmaceutical drugs to sue both the manufacturers and the wholesalers, it did so on the basis that the plaintiffs had alleged that the parties immediately upstream (i.e. the wholesalers) had colluded with the manufacturers to fix prices. The plaintiffs had not alleged that overcharges were passed on but rather that the wholesalers, as part of a price-fixing conspiracy, had directly imposed an overcharge on the plaintiff retailers. See Brand Name, 867 F.Supp. at 1344.
Most significantly, the district court in Brand Name emphasized that the reason it had not granted summary judgment in favor of the manufacturer-defendants was because “the plaintiffs ha[d] named [as defendants] a large percentage of all possible [wholesalers who had allegedly participated in the conspiracy].” Id. at 1346. The district court declined to “penalize[] [the plaintiffs] for the failure to join every single [wholesaler [involved in the alleged conspiracy].... ” Id.
*855 Plaintiffs here posit that they have joined all of the co-conspirators in the alleged conspiracy (i.e. the Hospital defendants and the Copy Service defendants). Reasoning that they have thereby satisfied the requirements of the co-conspirator exception, plaintiffs argue that they should therefore be accorded standing to bring an antitrust claim even though they are not direct purchasers. We cannot agree.
Plaintiffs misconstrue Brand Name and Link, and misconceive the nature of the co-conspirator exception. In order to fall within the exception, plaintiffs here would have to allege that the intermediaries immediately upstream, that is, the attorneys, colluded with the defendants to overcharge plaintiffs for the photocopies. Moreover, plaintiffs would be obliged to join the lawyers as defendants, which they have not done. In sum, the co-conspirator exception does not apply here.
E.
Plaintiffs also suggest that the present case falls within the “pre-existing cost-plus contract” exception to the direct purchaser rule. This exception arises from dictum in Hanover Shoe:
We recognize that there might be situations — for instance, when an overcharged buyer has a pre-existing “cost-plus” contract, thus making it easy to prove that he has not been damaged — where the considerations requiring that the passing-on defense not be permitted in this case would not be present.
Hanover Shoe, 392 U.S. at 494, 88 S.Ct. at 2232.
The vitality of the “pre-existing cost-plus contract” exception is doubtful, however, in light of UtiliCorp. The Supreme Court, in that case, expressly refused to recognize an exception to Illinois Brick even where one hundred percent of the cost increases had been passed through to indirect purchasers. Utilicorp, 497 U.S. at 216, 110 S.Ct. at 2816-17.
Moreover, even if this exception survived UtiliCorp, plaintiffs have failed to show that they meet the prerequisites of this exception. Specifically, plaintiffs have failed to show the existence of a pre-existing agreement to purchase a fixed quantity of photocopies from the attorneys. See Mid-West Paper, 596 F.2d at 580. In addition, as discussed earlier, plaintiffs have failed to demonstrate that they must pay the full cost of the copies since their liability for litigation costs is only contingent in nature.
In sum, plaintiffs have failed to establish that any exception to the direct purchaser rule obtains. Thus, we hold that plaintiffs lack standing to pursue their antitrust claim (count I).
IV.
Significantly, antitrust standing principles apply equally to allegations of RICO violations. See Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 270, 112 S.Ct. 1311, 1318-19, 117 L.Ed.2d 532 (1992). The precepts taught by Illinois Brick and UtiliCorp apply to RICO claims, thereby denying RICO standing to indirect victims. Wooten v. Loshbough, 951 F.2d 768, 770 (7th Cir.1991); County of Oakland v. City of Detroit, 866 F.2d 839, 851 (6th Cir.1989), cert. denied, 497 U.S. 1003, 110 S.Ct. 3235, 111 L.Ed.2d 747 (1990); Carter v. Berger, 111 F.2d 1173, 1176 (7th Cir.1985); Terre Du Lac Ass’n v. Terre Du Lac, Inc., 772 F.2d 467, 473 (8th Cir.1985), cert. denied, 475 U.S. 1082, 106 S.Ct. 1460, 89 L.Ed.2d 718 (1986); Daley’s Dump Truck Serv., Inc. v. Kiewit Pac. Co., 759 F.Supp. 1498, 1504 (W.D.Wash. 1991), aff'd sub. nom., Imagineering, Inc. v. Kiewit Pac. Co., 976 F.2d 1303 (9th Cir.1992), cert. denied, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). Indeed, plaintiffs have conceded that, if they lacked antitrust standing, they also lacked RICO standing. See Plaintiffs’ Motion to Secure Certification (Nov. 29, 1994), at 3-4 (App. at 1168-69).
Hence, the central and dispositive issue is whether plaintiffs are “direct purchasers.” If so, they are entitled to pursue both their antitrust and RICO claims. If not, and insofar as damages are concerned, the district court properly granted summary judgment in favor of the defendants.
*856 V.
Finally, plaintiffs argue that even if they lack standing to recover damages under section 4 of the Clayton Act,[20] they may still seek injunctive relief under section 16 of the Act.[21]
Standing analysis under section 16 is not identical to that for section 4. See Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 111 n. 6, 107 S.Ct. 484, 490 n. 6, 93 L.Ed.2d 427 (1986). “Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4 ... and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy_” Schoenkopf v. Brown & William son Tobacco Corp., 637 F.2d 205, 210 (3d Cir.1980). Most importantly, “because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries [i.e. the concerns voiced in Illinois Brick ], some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.” Cargill, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6.
In Mid-West Paper, we expressly rejected the contention that the direct purchaser rule bars injunctive relief under section 16 as well as a treble damages suit under section 4. We explained that
in contrast to the treble damage action, a claim for injunctive relief does not present the countervailing considerations — such as the risk of duplicative or ruinous recoveries and the spectre of a trial burdened with complex and conjectural economic analy-ses — that the Supreme Court emphasized when limiting the availability of treble damages.
Mid-West Paper, 596 F.2d at 590. See also Merican, 713 F.2d at 962 n. 6; In re Beef Indus. Antitrust Litig., 600 F.2d 1148, 1167 (5th Cir.1979), cert. denied, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). We cautioned that
the rule of standing urged by the defendants, which would completely bar indirect purchasers from seeking injunctive relief, would leave a serious gap in the antitrust enforcement scheme, as the fate of these injured parties, and of the competitive economy in an entire industry, would be made dependent upon the willingness of the government and the direct purchasers to assume the burdens of a lengthy lawsuit.
Mid-West Paper, 596 F.2d at 593-94.
Although plaintiffs need not satisfy Illinois Brick’s, “direct purchaser” requirement in order to seek injunctive relief, they must still make a threshold showing of entitlement to injunctive relief. That is, plaintiffs must show: (1) threatened loss or injury cognizable in equity; (2) proximately resulting from the alleged antitrust violation. City of Rohnert Park v. Harris, 601 F.2d 1040, 1044 (9th Cir.1979), cert. denied, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); Central Nat’l Bank v. Rainbolt, 720 F.2d 1183, 1186 (10th Cir.1983). Because the district court never considered whether plaintiffs would be entitled to injunctive relief under section 16, separate and apart from the Illinois Brick standing rule, we will remand to allow the district court to undertake such an analysis.
VI.
For the foregoing reasons, we will affirm the district court’s grant of summary judgment in favor of the defendants on plaintiffs’ treble-damages claim (count I) and RICO *857 claim (count II),[22] but we will reverse as to plaintiffs’ claim for injunctive relief and remand for further proceedings consistent with this opinion.[23]

. McCarthy died subsequent to the institution of this litigation. A persona] representative has been named for her but has not been formally substituted on the record, as of the date of this appeal.

. Tomasetti died after commencing this action. No personal representative has been named as of the date of this appeal.

. The Hospital Defendants are Mercy Health Corporation of Southeastern Pennsylvania, Mi-sericordia Hospital Division ('‘Misericordia”); Methodist Hospital ("Methodist”); the Graduate Hospital (“Graduate"); Hahnemann University Hospital ("Hahnemann”); and the Lower Bucks Hospital (“Lower Bucks"). They are all hospital corporations that operate hospitals in the Commonwealth of Pennsylvania.

. The Copy Service Defendants are Recordex Services, Inc. (“Recordex"), CopyRight, Inc. ("CopyRight”), Smart Corporation ("Smart”), Medfax, Inc. ("MedFax”), and Hospital Correspondence, Copiers ("HCC”). They are all corporations doing business in the Commonwealth of Pennsylvania, who have entered into contracts with one of the Hospital Defendants to perform copying services in response to requests for copies of hospital records.

. Count I specifically alleges that the defendants engaged in a "contract combination or conspiracy in restraint of trade effecting [sic] interstate commerce”; and that "the defendants possess a monopoly in the relevant market for the performance of copying services of hospital patient records, and have willfully maintained that power in order to illegally extract unlawful prices for the performance of said copy services.” Complaint at ¶ 52.

. The complaint alleges a violation of 18 U.S.C. § 1433, a nonexistent statute. We presume that plaintiffs intend to state a civil RICO claim pursuant to 18 U.S.C. § 1964.

. Tomasetti retained M & F, which requested copies of patient records from Hahnemann; Re-cordex provided the photocopying services and charged M & F $44.40. Hoffman retained M & F, which requested copies of records from Lower Bucks; MedFax performed the photocopying and charged M & F $19.22. Both Tomasetti and Hoffman settled their cases and reimbursed M & F out of their settlement proceeds for the photocopying costs.
Colville retained M & F, which requested copies from Methodist; Smart, which performed the photocopying, charged M & F $25.49. Ormsby also retained M & F, which requested copies from Graduate; HCC photocopied the records, charging M & F $38.40. At the time this appeal was filed, neither Colville nor Ormsby had reached a settlement, and neither had reimbursed M & F for the copying expenses incurred. Ormsby has apparently discontinued his personal injury claim. App. at 536.
McCarthy retained F & S, which requested copies of her medical records from Misericordia. CopyRight, which was responsible for providing copying services related to requests for Miseri-cordia patient records, billed F&S$540. F&S refused to pay the bill but eventually obtained the copies from opposing counsel. App. at 517-20, 525.

. The four plaintiffs other than McCarthy entered into contingent fee agreements with M & F. Under these agreements, the law firm would receive its fee (33-1/3% for Tomasetti and 40% for each of the other three plaintiffs) only if it successfully litigated or settled the case. Under Colville's contract, M & F would be entitled to 40% of die recovery plus reimbursement of any costs. The other three contracts only awarded M & F a percentage of the recovery (i.e. M & F would have to cover its costs out of its percentage share of the settlement or award).
None of the fee agreements entitled M & F to reimbursement of costs if the client failed to recover. Colville’s contract provided: "If there is no recovery there will be no charge for services rendered." App. 414. Likewise, Hoffman’s agreement stated: “If no monies are recovered there will be no fee for services rendered.” App. 433. Ormsby’s agreement similarly read: "If there is no recovery, there are no charges for any fees.” App. 455. Finally, Tomasetti’s contingent fee agreement provided: "If no monies are recovered attorney to have no claim for services rendered.— Attorney to advance all costs necessary, & to be reimbursed at settlement.” App. 470.

. If McCarthy prevailed, F & S would receive a 1/3 contingent fee (calculated based on the amount of the award or settlement before deducting expenses) plus litigation expenses.

. Richard C. Ferroni, a partner at M & F, similarly stated in an affidavit that
[h]e had not, nor has his firm, ever sought reimbursement for costs (including costs of obtaining copies of a client's hospital records) from a client where there has not been a recover}’ in the action in which he or his firm has represented the client and the Contingent Fee Agreement does not address costs, although clients are advised they are responsible for costs regardless of outcome.
App. 536.

. For example, Medicare copy requests were billed at seven cents per page; and the Workmen’s Compensation Appeal Board paid a ten dollar flat fee per request regardless of the number of pages actually copied.

. For example, other hospitals, physician’s offices, Blue Cross and Blue Shield, the Veteran’s Administration and social service agencies received copies for free. The military and certain HMOs also received free copies.

. Prior to AGC, the courts of appeals applied a variety of different tests to determine standing under section 4 of the Clayton Act: (1) the "direct injury” test, see Chrysler Corp. v. Fedders Corp., 643 F.2d 1229, 1233 (6th Cir.), cert. denied, 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981); Loeb v. Eastman Kodak, 183 F. 704, 709 (3d Cir.1910); (2) the "zone of interests” test, see Malamud v. Sinclair Oil Corp., 521 F.2d 1142, 1151-1152 (6th Cir.1975); and (3) the "target area” test, see Pan-Islamic Trade Corp. v. Exxon Corp., 632 F.2d 539, 546-47 (5th Cir.1980), cert. denied, 454 U.S. 927, 102 S.Ct. 427, 70 L.Ed.2d 236 (1981); Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc., 454 F.2d 1292, 1295 (2d Cir.1971), cert. denied, 406 U.S. 930, 92 S.Ct. 1776, 32 L.Ed.2d 132 (1972). Recognizing that these alternative formulations for assessing antitrust standing often led to contradictory and inconsistent results, the Supreme Court in AGC attempted to articulate a unified set of factors that could be applied generally in determining antitrust standing.

. Of course, AGC and Illinois Brick address two analytically distinct aspects of antitrust standing. See Merican, 713 F.2d at 963-65 (noting that "the Supreme Court has recognized two types of limitations on the availability of the section 4 remedy which the courts must consider when examining whether a treble damage action may be maintained”). The AGC Court was concerned primarily with the issue of whether a particular plaintiff’s injury was too remote from an antitrust injury to warrant providing that plaintiff a section 4 remedy. Id. at 964. This inquiry, akin to the determination of "proximate cause” in the negligence context, is subtle and resists the use of hard-and-fast “black letter” rules. See id.
In contrast, Illinois Brick dealt with the issue of whether a plaintiff who is able to trace an injury to an antitrust violation falls “within the group of 'private attorneys general' that Congress created to enforce the antitrust laws under section 4.” Id. at 963. Illinois Brick focuses exclusively on the risk of duplicative recovery and the potential for overly-complex damages and apportionment calculations. Id. at 963-64. Because there would always be a risk of duplica-tive recovery, as well as the potential for complex apportionment computations, if indirect purchasers were allowed to bring antitrust claims, the "direct purchaser” rule, unlike the AGC standard, is a bright-line rule.

. The other defendants all settled before trial.

. Plaintiffs. first contend that their attorneys cannot be considered part of the chain of distribution because they do not make a profit from, or charge separately for, the photocopies. We are not persuaded for at least two reasons. First, in order for a consumer to be considered an indirect purchaser of an item, it is not necessary that the consumer incur a separate charge for that item; it is only necessary that the consumer have purchased the item through a middleman. For example, a homeowner who hires a housepainter who charges by the hour and does not invoice the homeowner separately for the cost of materials cannot be considered the "direct purchaser" of the paint used by the house-painter.
Second, attorneys do profit, albeit indirectly, from their purchase of their clients' hospital record photocopies. That is, they earn a contingent fee at the end of a successful action. Moreover, even if the attorneys failed to profit (or even if they suffered a loss) on the transaction, this fact does not transform their clients into direct purchasers. For example, in the previous hypothetical, the homeowner would still be considered an indirect purchaser even if the housepainter had charged a fee insufficient to recoup the costs of the paint job or if the housepainter had charged no fee at all.

. The district court relied on the dictum in footnote 16 of Illinois Brick, which stated: "Another situation in which market forces have been superseded and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer.” Illinois Brick, 431 U.S. at 736 n. 16, 97 S.Ct. at 2070 n. 16 (citing Perkins v. Standard Oil Co., 395 U.S. 642, 648, 89 S.Ct. 1871, 1874-75, 23 L.Ed.2d 599 (1969) and In re Western Liquid Asphalt Cases, 487 F.2d 191, 197, 199 (9th Cir.1973), cert. denied, 415 U.S. 919, 94 S.Ct. 1419, 39 L.Ed.2d 474 (1974)). Because Harvey "controlled” Biddle's actions regarding purchases made on Harvey’s behalf, the district court "view[edj the relationship between Harvey and Biddle as falling within the above exception.” In re Toilet Seat Antitrust Litigation, 1977-2 Trade Cases ¶61,-601, at 72,497.

. Plaintiffs are no more direct purchasers of the hospital record photocopies at issue here than a passenger in a taxicab would be considered a direct purchaser of the gasoline used by the taxicab to carry the passenger to his destination. Moreover, even if a separate charge for gasoline were assessed, the taxi passenger still could not be considered a direct purchaser in any sense.

. The attorneys are the real parties in interest. Indeed, as noted previously, the district court offered the plaintiffs’ attorneys an opportunity to substitute themselves as the plaintiffs of record. Although the defendants did not object to the district court's proposal, the attorneys for the plaintiffs declined the court's offer, choosing instead to appeal the district court’s adverse ruling as to standing.
We acknowledge that generally an attorney is to be considered the agent of the client, and as such, would not be held personally liable for expenditures made for a disclosed principal. See Messenger Publishing Co. v. Walkinshaw, 102 Pa.Super. 445, 157 A. 18 (1931). However, the Pennsylvania Supreme Court has yet to address this subject and there is a wealth of authority that an attorney ordering goods or services in connection with litigation, as is the case here, ordinarily be treated as a principal and hence would be liable for such expenses.
Even the lower courts in Pennsylvania, whose decisions are not binding on us, have had difficulty with this issue. See Pessano v. Eyre, 13 Pa.Super. 157 (1900). But neither the cases revealed by the parties' research nor those revealed by our own research have discussed this issue in the context of a federal antitrust action, such as we have here. In none of those cases was the Illinois Brick direct purchaser rule at issue. We are satisfied that in the instant antitrust context, the attorney-appellants do not have standing to prosecute this action.

. Section 4 of the Clayton Act allows for recovery of treble damages in a private antitrust action:
[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.
15 U.S.C. § 15(a).

. Section 16 provides in relevant part:
Any person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws.
*857 15 U.S.C. § 26.

. Count III, the civil rights claim, was dismissed by the district court and is not on appeal before us.

. Although the injunctive relief issue was only perfunctorily briefed and discussed, we seriously question whether the issue can be successfully pursued. We note, for instance, that plaintiffs apparently have obtained all of the medical records relevant to their particular personal injury claims, and there is little, if any, likelihood that plaintiffs will request additional copies of those records from the defendants. Moreover, it is highly doubtful that additional hospital records pertaining to plaintiffs’ personal injury claims will be generated. Nevertheless, because our precedents require that a claim for an injunction under section 16 be treated differently than a claim for treble damages under section 4, it is appropriate that the district court, rather than this Court, consider the merits of the claim for injunctive relief in the first instance.